# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| HEALTHBANC INTERNATIONAL, LLC and BERNARD FELDMAN, <br><br> Plaintiffs and Counterclaim Defendants, <br><br> v. <br><br> SYNERGY WORLDWIDE, INC. and NATURE'S SUNSHINE PRODUCTS, INCORPORATED, <br><br> Defendants and Counterclaim Plaintiffs. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY <br><br> Case No. 2:16-cv-00135-JNP-PMW <br><br> District Judge Jill N. Parrish |

Plaintiff HealthBanc International, LLC sued Synergy Worldwide, Inc. for breach of a royalty agreement. Bernard Feldman, the sole member of HealthBanc, also sued Nature's Sunshine, Inc. and Synergy for breach of a separate confidentiality agreement. Synergy countersued, alleging that HealthBanc had breached the royalty agreement and that HealthBanc and Feldman were liable for fraudulent inducement. Before the court is a motion for summary judgment brought by Synergy and Nature's Sunshine [Docket 125], motions for summary judgment brought by HealthBanc and Feldman [Docket 129, 150], and motions brought by both sides to exclude expert witness testimony [Docket 121, 122].

The court GRANTS IN PART and DENIES IN PART Synergy and Nature's Sunshine's motion for summary judgment. [Docket 125]. The court also GRANTS IN PART and DENIES IN PART HealthBanc and Feldman's motions for summary judgment. [Docket 129, 150]. The court

GRANTS HealthBanc's motion to exclude expert testimony [Docket 121] and DENIES AS MOOT Synergy's motion to exclude expert testimony [Docket 122].

**BACKGROUND**

HealthBanc created a recipe for a powder comprised of various grasses and other natural ingredients called the Greens Formula. The Greens Formula can be combined with water to create a nutritional supplement.

The owner of HealthBanc, Feldman, alleges that he entered into a confidentiality agreement with Nature's Sunshine, which also bound its subsidiary, a multi-level marketing company called Synergy.[1] The confidentiality agreement required Nature's Sunshine and Synergy to maintain the confidentiality of the Greens Formula.

HealthBanc also entered into a royalty agreement with Synergy. Under the terms of the agreement, HealthBanc assigned to Synergy its "entire rights, title, and interest in and to the Greens Formula, including, without limitation, all patent rights and other intellectual property rights of any kind." In exchange, Synergy agreed to "pay HealthBanc a royalty on net unit sales by Synergy for Greens Formula equal to One Dollar and Seventy Five Cents ($1.75) per 150 gram bottle of the Greens Formula which is sold by Synergy."

The recipe for the Greens Formula is described in Exhibit A and Exhibit B attached to the royalty agreement. Exhibit A lists the original formula, while Exhibit B describes a variation of the Greens Formula that purports to comply with California's Proposition 65. The Exhibit A and Exhibit B versions of the of Greens Formula have the same 22 ingredients. But in the Exhibit B

---

[1] Rather than submit evidence of this confidentiality agreement, the parties relied upon the allegations in HealthBanc's and Feldman's complaint. Nature's Sunshine and Synergy have not objected to this absence of evidence.

formula, five of the ingredients are in different proportions than the ingredients for the Exhibit A formula. The other 17 ingredients are in the same proportions in both the Exhibit A and Exhibit B versions of the formula.

Using the Exhibit B iteration of the Greens Formula, Synergy began to sell a product called Core Greens in 2006. Core Greens was initially sold in 150-gram bottles. Synergy later used the Core Greens formula to create capsules that were sold in 150-gram increments alongside the bottled product.

Over the years, Synergy made several changes to the recipe of the Core Greens product. In 2008, Synergy eliminated an ingredient that accounted for 23.77% of the original formula because Synergy could "no longer source the material." Synergy compensated for this loss by increasing the amounts of four other existing ingredients. In 2009, Synergy excluded another ingredient that comprised .22% of the Core Greens formula because it had "become difficult to source." Synergy increased the proportion of three other ingredients. In 2013, Synergy removed an ingredient that accounted for .06% of the Core Greens formula because it had become "extremely difficult to source" and increased the amount of one of the other existing ingredients. Finally, in 2014, Synergy eliminated an ingredient that comprised 5.3% of the Core Greens formula because it had been discontinued by the supplier and it was difficult to find a new supplier. This ingredient was replaced by a new ingredient not found in the original Greens Formula. During the course of these changes to the Core Greens formula, Synergy continued to pay a $1.75 royalty for net unit sales for the Core Greens bottles and capsules.

In 2013, a dispute arose between Synergy and HealthBanc. In September of that year, Synergy inadvertently sent a document to HealthBanc detailing sales numbers for a Core Greens product in South Korea. HealthBanc had previously been unaware of these sales and argued to

Synergy that it was entitled to royalties for sales in South Korea and other foreign countries. Synergy, however, asserted that it did not have to pay royalties for the foreign sales. Over the next two years, the parties attempted to resolve this business dispute. The principals of Synergy and HealthBanc met in November 2015 to discuss the disagreement but did not come to any resolution. Synergy stopped making royalty payments after it made a payment for sales for the month of November 2015.

In February 2016, HealthBanc sued Synergy for breach of contract and for breach of the covenant of good faith and fair dealing. HealthBanc alleged that Synergy broke its promise to pay royalties that were owed from sales in a number of foreign countries and by underpaying for sales made in the United States. HealthBanc requested monetary damages for unpaid royalties and an injunction prohibiting "Synergy from replacing the Greens Formula with a separate formula." Feldman also sued Nature's Sunshine and Synergy, asserting that they had breached the confidentiality agreement by publishing information about the Greens Formula on the packaging of products sold in South Korea.

Synergy countersued HealthBanc, alleging that HealthBanc had breached the royalty agreement and engaged in fraudulent inducement by falsely implying that it held intellectual property rights for the Greens Formula. Synergy also claimed that HealthBanc breached the royalty agreement by failing to provide contractually required consultation services.

In 2016, Synergy began selling the Core Greens formula in single-serve foil packages referred to as a "stick packs." The stick packs are sold in 150-gram increments. Synergy added an anti-caking agent that is useful for this new form of packaging and rebranded the product as Essential Greens. Synergy asserts in this litigation that it has no obligation to pay royalties for the Essential Greens stick packs or the Core Greens capsules.

I.    **SYNERGY'S AND NATURE'S SUNSHINE'S MOTION FOR SUMMARY JUDGMENT**

Synergy and Nature's Sunshine move for summary judgment, asserting three main arguments. First, Synergy contends that it is entitled to partial summary judgment on HealthBanc's claim for damages for breach of the royalty agreement and breach of the covenant of good faith and fair dealing. Second, Synergy argues for summary judgment on HealthBanc's injunctive relief claim. And third, Nature's Sunshine and Synergy assert that they are entitled to summary judgment on Feldman's claim for breach of the confidentiality agreement.

A.    *Damages Claim Against Synergy*

Synergy argues that, as a matter of law, HealthBanc is not entitled to royalties for two categories of sales. First, it asserts that it has no obligation to pay royalties for sales of the Essential Greens product because the formula for this product is different from the Greens Formula referenced in the royalty agreement. Second, Synergy contends that it has no obligation to pay royalties on products sold in stick packs or in capsules because the royalty agreement only requires it to pay a fee for products sold in bottles.

1)    Changes to the Core Greens/Essential Greens Formula

The royalty agreement requires Synergy to pay fees for the sale of products made using the Greens Formula. Two versions of the Greens Formula were attached to the agreement as Exhibit A and Exhibit B. In 2006, Synergy began selling a product called Core Greens using the Exhibit B version of the Greens Formula.

Over the years, though, Synergy made changes to the formula for its Core Greens product. It eliminated three of the 22 ingredients found in the original Greens Formula because of difficulties in purchasing these ingredients. Synergy increased the proportions of other existing

ingredients to make up the difference. Synergy also eliminated a fourth ingredient due to sourcing problems and replaced it with a new ingredient. Finally, Synergy changed the name of its product from Core Greens to Essential Greens and changed the way that it was packaged. Synergy added a small amount of an anti-caking agent to facilitate the new packaging configuration.

Synergy argues that it has no contractual obligation to pay royalties on sales of the Essential Greens product because it is not made from the Greens Formula. It contends that the changes that it made to the Greens Formula over the years have transformed Essential Greens into a new product that is not subject to the royalty agreement.

HealthBanc makes two arguments in response. First it argues that the exact definition of the term "Greens Formula" in the royalty agreement is ambiguous, requiring consideration of extrinsic evidence to determine its meaning. HealthBanc contends that because extrinsic evidence must be evaluated by a jury, summary judgment is not appropriate. Second, HealthBanc argues that Synergy's decision to modify the Greens Formula and stop paying a royalty on the resulting product violates both an explicit good faith provision found in the royalty agreement and the implied covenant of good faith and fair dealing. The court addresses each of HealthBanc's arguments in turn.

i.     Extrinsic Evidence

Generally, parties may not introduce extrinsic evidence of the meaning of a contract unless the language of the contract is facially ambiguous. *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 367 P.3d 994, 1001 (Utah 2016); *Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 975 (Utah 2009). "A contract is facially ambiguous if its terms are 'capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Mind & Motion*, 367 P.3d at 1001 (citation omitted). In other words, "a contract provision is

ambiguous only where the parties submit tenable contrary readings of the provision." *Layton City v. Stevenson*, 337 P.3d 242, 248 (Utah 2014); *see also Brady v. Park*, No. 20160425, 2019 WL 2051350, at *11 (Utah May 8, 2019) ("Under our caselaw a reasonable interpretation is an interpretation that cannot be ruled out, after considering the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended.").

The parties in this litigation disagree as to whether the meaning of the term "Greens Formula" is ambiguous as it is used in the key payment provision of the royalty agreement. The agreement provides: "Synergy will pay HealthBanc a royalty on net unit sales by Synergy for Greens Formula . . . ." Synergy argues that "Greens Formula," as it is used in this clause, is not ambiguous and can only be read to mean one of the exact formulas attached as Exhibits A and B to the royalty agreement. HealthBanc, on the other hand, asserts that this term is ambiguous because provisions of the contract suggest that "Greens Formula" includes modified versions of the formula.

The royalty agreement does not contain an explicit definition of "Greens Formula." The introductory recitals section of the contract, however, sheds some light on the term. This section states:

> B.     HealthBanc has expertise in the development of nutritional products and has developed an exclusive formula known as Greens Formula (the "Greens Formula").
>
> C.     Synergy desires to purchase from HealthBanc the Greens Formula as defined in <u>Exhibit A</u> and <u>Exhibit B</u> and HealthBanc desires to supply the Greens Formula exclusively to Synergy, pursuant to the terms and conditions set forth below in this Agreement.

D.     If it becomes necessary to make a change to the formula to enter various countries, wherein Synergy may sell this product, both Synergy and HealthBanc will work together to facilitate changes to the product.

In the representations and warranties section of the royalty agreement, HealthBanc also warrants that it is the sole and exclusive owner of "the Greens Formula, as identified in <u>Exhibit A</u> and <u>Exhibit B</u> attached hereto."

Synergy argues that Recital C and the warranties section of the royalty agreement explicitly define the term "Greens Formula" as the two formulas attached to the contract. It contends, therefore, that it is required to pay royalties only on products made from one of these two precise formulas; any derivative formulas are excluded from the definition of "Greens Formula" and no payment of royalties is required for the sale of products made from derivative formulas.

The court concludes, however, that the term "Greens Formula" is ambiguous because there is another plausible reading of this term that is "reasonably supported by the language of the contract." *See Daines v. Vincent*, 190 P.3d 1269, 1277 (Utah 2008) (citation omitted). In order to determine whether a term is ambiguous, courts must look to the contract as a whole. *Id.* "Greens Formula" is first defined in Recital B as "an exclusive formula" developed by HealthBanc "known as Greens Formula (the "Greens Formula")." Recital C then states that Synergy desires to purchase the versions of the Greens Formula "defined in <u>Exhibit A</u> and <u>Exhibit B</u>." But this statement is immediately followed by language in Recital D that contemplates future modifications to the Greens Formula: "If it becomes necessary to make a change to the formula to enter various countries, wherein Synergy may sell this product, both Synergy and HealthBanc will work together to facilitate changes to the product." Paragraph 4 of the royalty agreement also suggests that future changes may be made to the Greens Formula. This provision requires HealthBanc to provide to

8

Synergy "consultation services as may be reasonably required in order to research, *develop* and market the Greens Formula." (Emphasis added). The royalty agreement, therefore, contemplates that the parties would work together to "facilitate changes to" and "develop" the Greens Formula. Thus, the term "Greens Formula," as used in the royalty provision, can be read to incorporate modifications made to the original formulas purchased by Synergy.

Another provision of the royalty agreement adds to the ambiguity surrounding the term "Greens Formula." The agreement contains a good faith clause, which provides: "The parties agree to maintain good faith, loyalty and mutual respect towards each other during the course of this agreement." Synergy's contractual duty of good faith could reasonably be interpreted to support HealthBanc's construction of "Greens Formula" to include derivative versions of the Exhibit A and Exhibit B iterations of the formula. Making non-material changes to the formula in order to escape the obligation to pay royalties could be a violation of the good faith provision. Thus, the good faith provision plausibly supports HealthBanc's interpretation of the term "Greens Formula" to include derivative versions of the formula.

In short, "Greens Formula," as it is used in the royalty provision, is ambiguous. The parties may introduce extrinsic evidence, including their course of performance in relation to derivative formulas, to resolve this ambiguity. *See WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1145 (Utah 2002) ("If a contract is ambiguous, the court may consider the parties' actions and performance as evidence of the parties' true intention."). This is a question for the jury that may not be resolved by the court on summary judgment. *See Brady*, 2019 WL 2051350, at *12. Therefore, the court denies partial summary judgment on the issue of whether royalties are owed on the Essential Greens product.

ii.     Covenant of Good Faith and Fair Dealing

As noted above, the royalty contract contains a good faith provision, which provides: "The parties agree to maintain good faith, loyalty and mutual respect towards each other during the course of this agreement."[2] In addition, the parties are bound by the implied covenant of good faith and fair dealing inherent in every contract. *See Oman v. Davis Sch. Dist.*, 194 P.3d 956, 968 (Utah 2008). "Under the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Id*. (citation omitted). "To determine the legal duty a contractual party has under this covenant, a court will assess whether a 'party's actions [are] consistent with the agreed common purpose and the justified expectations of the other party.'" *Oakwood Vill. LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1239–40 (Utah 2004) (alteration in original) (citation omitted). The parties' common purpose and justified expectations are determined "by considering 'the contract language and the course of dealings between and conduct of the parties.'" *Id.* at 1240 (citation omitted); *see also Eggett v. Wasatch Energy Corp.*, 94 P.3d 193, 197 (Utah 2004) ("Extrinsic evidence may be admissible to prove a claim for breach of the covenant of good faith and fair dealing.").

The "core function" of the covenant of good faith and fair dealing is to prevent "another's opportunistic interference with the contract's fulfillment." *Young Living Essential Oils, LC v. Marin*, 266 P.3d 814, 817 (Utah 2011). This core function "protects commercial reliance interests" by implying terms "that the parties surely would have agreed to if they had foreseen and addressed

---

[2] HealthBanc references this term of the royalty agreement but does not explain how this provision differs from the implied covenant of good faith and fair dealing or develop an independent argument that Synergy breached this clause of the contract. The court, therefore, confines its analysis to the implied covenant.

the circumstance giving rise to their dispute." *Id.* at 816–17. But the Utah Supreme Court has cautioned that the covenant of good faith and fair dealing should serve a limited role because judicial misuse of this legal principle "threatens 'commercial certainty and breed[s] costly litigation.'" *Id.* at 816 (alteration in original) (citation omitted).

To prevent unwarranted interference with the terms of contracts, the Utah Supreme Court has articulated several principles that limit the application of the covenant of good faith and fair dealing. The covenant may not be employed to "create obligations 'inconsistent with express contractual terms.'" *Id.* at 817 (citation omitted). Additionally, "this covenant cannot compel a contractual party to exercise a contractual right 'to its own detriment for the purpose of benefitting another party to the contract.'" [3] *Oakwood Vill.*, 104 P.3d at 1240 (citation omitted).

---

[3] Quoting language from *Oakwood Village*, Synergy argues that there is an additional limitation to the application of the covenant of good faith and fair dealing. In that case, the Utah Supreme Court stated that "this covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante." *Oakwood Vill.*, 104 P.3d at 1240. But the Utah Supreme Court later repudiated this statement:

> [W]e have also sometimes asserted that the covenant " 'cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante.' " Properly conceived, however, that proviso merely restates the proscription against using the covenant to establish new rights or duties that are "*inconsistent with* express contractual terms," as the covenant would be completely negated if it could never establish any independent rights not expressly agreed to by contract. To the extent our cases suggest otherwise—indicating a broad proscription against *ever* using the covenant to establish duties not expressly agreed to by the parties—we disavow those suggestions here.

*Young Living*, 266 P.3d at 817 n.4. (citation omitted).

"[W]hether there has been a breach of good faith and fair dealing is a factual issue, generally inappropriate for decision as a matter of law." *Oman*, 194 P.3d at 968 (alteration in original) (citation omitted). But the Utah Supreme Court has not hesitated to reject claims for breach of this covenant as a matter of law where the cause of action is clearly meritless. In *Young Living*, for example, the Utah Supreme Court affirmed summary judgment on a breach of good faith and fair dealing claim where the alleged covenant was ancillary to the purpose of the contract. 266 P.3d at 817. Thus, the breach of the alleged covenant did not "destroy or injure the other party's right to receive the fruits of the contract." *Id.* (citation omitted). The court has also rejected breach of good faith and fair dealing claims as a matter of law where the alleged covenant contradicted express contractual terms. *See Oman*, 194 P.3d at 969; *Oakwood Vill.*, 104 P.3d at 1240.

Under the facts of this case, the court may not resolve HealthBanc's good faith and fair dealing claim as a matter of law. First, HealthBanc has presented a plausible argument that Synergy breached an implied "promise not to intentionally do anything to injure [HealthBanc's] right to receive the benefits of the contract." *See Oman*, 194 P.3d at 968. The bargain at the heart of the royalty agreement is that HealthBanc would transfer its rights to the Greens Formula to Synergy, and in return, Synergy would pay a royalty to HealthBanc for products made from the formula. If Synergy were able to avoid entirely the obligation to pay royalties by making modest changes to the formula, Synergy could arguably retain the benefit of the bargain while destroying HealthBanc's right to receive the fruits of the contract.[4]

_____

[4] Synergy emphasizes the differences between the original Greens Formula and the formula that it now uses for Essential Greens, asserting that it currently uses a new formula rather than a derivative formula. HealthBanc, on the other hand, emphasizes the similarities between the original Greens Formula and the formula for Essential Greens. The question of whether the current formula is new or derivative is a question of fact for the jury.

Second, the alleged implied covenant to pay royalties on formulas derived from the original Greens Formula is not inconsistent with an express term of the royalty agreement. As noted above, the royalty agreement is ambiguous as to whether the language of the contract requires the payment of royalties for derivative formulas. But even if a jury, after considering extrinsic evidence, concludes that the text of the royalty agreement requires fee payments only for products made from the original Greens Formula, an implied covenant to pay fees on derivative products would not be inconsistent with this express term. This alleged implied covenant to pay royalties on derivative products would merely supplement the written provision.

In short, the court concludes that it may not grant summary judgment in favor of Synergy on HealthBanc's covenant of good faith and fair dealing claim. This claim must be resolved by a jury.

2)      Changes to the Packaging of the Core Greens/Essential Greens Product

Synergy initially sold its Core Greens powder in 150-gram bottles. It also began to sell Core Greens capsules in 150-gram packages. In 2016, Synergy rebranded its Core Greens product as Essential Greens, which was packaged in single-serve foil stick packs. Essential Greens stick packs are also sold in 150-gram packages. The royalty agreement provides: "Synergy will pay HealthBanc a royalty on net unit sales by Synergy for Greens Formula equal to One Dollar and Seventy Five Cents ($1.75) per 150 gram bottle of the Greens Formula which is sold by Synergy." Synergy argues that this provision requires it to pay royalties only for the sale of products sold in bottles. In short, it reads this provision to effectively state: "Synergy will pay HealthBanc a $1.75 royalty for each 150-gram bottle of Greens Formula sold." It asserts, therefore, that the sale of capsules and stick packs must be excluded from any award for breach of the royalty agreement.

In interpreting this provision, the court first looks to the plain language to determine its meaning. *See Brady v. Park*, No. 20160425, 2019 WL 2051350, at *10 (Utah May 8, 2019). The plain language of the royalty provision clearly contradicts Synergy's reading of this clause. The royalty provision describes two distinct concepts. The first half of the provision states what Synergy must pay a royalty for: "Synergy will pay HealthBanc a royalty on net unit sales by Synergy for Greens Formula . . . ." The second half of the provision describes the amount of the royalty, which shall be "equal to One Dollar and Seventy Five Cents ($1.75) per 150 gram bottle of the Greens Formula which is sold by Synergy." Taken together, the language of the royalty provision requires Synergy to pay royalties on "net unit sales" of Greens Formula,[5] with the amount of the royalty being the equivalent of $1.75 per 150-gram bottle.

Thus, the language of the royalty provision requires the payment of royalties for "net unit sales," not for "bottles" of Greens Formula, as Synergy argues. And Synergy does not assert that the sale of packages of capsules or stick packs are not net unit sales.[6] The court, therefore, rejects as a matter of law Synergy's argument that it need not pay royalties for capsules and stick packs and denies summary judgment on this issue.

---

[5] The royalty provision clarifies that the term "net unit sales" refers to "gross unit sales of the Greens Formula" minus deductions for returned product.

[6] Nor does Synergy argue that the amount of the royalty for a 150-gram package of capsules or stick packs should differ from the $1.75 royalty for 150-gram bottles.

*Injunctive Relief Claim Against Synergy*

HealthBanc pled a cause of action for breach of contract and a separate cause of action for breach of the covenant of good faith and fair dealing. It demanded damages for its breach of contract claim. For its breach of the covenant of good faith and fair dealing claim, HealthBanc demanded both damages and "an injunction precluding Synergy from breaching its duties of good faith and loyalty and precluding Synergy from replacing the Greens Formula with a separate formula." But in its general prayer for relief in the complaint, HealthBanc does not request an injunction.

Synergy argues that it is entitled to summary judgment on its request for injunctive relief because no provision of the royalty agreement precludes it from discontinuing the sale of products using the Greens Formula. But Synergy's argument is misplaced. HealthBanc's request for injunctive relief is not based upon the contract. It has only pled an injunctive relief claim based upon the implied covenant of good faith and fair dealing. In its reply brief, Synergy argues in one sentence that the covenant of good faith and fair dealing cannot support the requested injunction because the covenant cannot be used to "make Synergy do what it never agreed to do." This assertion, however, is legally incorrect. As noted above, the Utah Supreme Court has explicitly held that the covenant of good faith and fair dealing can create obligations that the parties to a contract never explicitly agreed to. *Young Living Essential Oils, LC v. Marin*, 266 P.3d 814, 817 n.4 (Utah 2011).

Accordingly, the court denies summary judgment on HealthBanc's injunctive relief claim. The court will address the injunctive relief claim after the jury renders a verdict. *See Rocky Mountain Christian Church v. Bd. of Cty. Comm'rs*, 613 F.3d 1229, 1240 (10th Cir. 2010) (When

ruling on an injunctive relief claim, "a district court is bound both by a jury's explicit findings of fact and those findings that are necessarily implicit in the jury's verdict." (citation omitted)).

C.  *Feldman's Breach of Contract Claim Against Nature's Sunshine and Synergy*

Feldman alleges that Nature's Sunshine and Synergy breached a confidentiality agreement by publishing confidential information about the Greens Formula on packaging for a product sold in South Korea. Nature's Sunshine and Synergy argue that they are entitled to summary judgment on this claim because Feldman failed to disclose any evidence of damages caused by the alleged breach.

Feldman responds that he does not seek actual damages for this claim. Instead, he requests injunctive relief and nominal damages. Feldman may not obtain injunctive relief for this claim because he did not ask for it in his complaint. FED. R. CIV. P. 8(a) ("A pleading that states a claim for relief must contain . . . a demand for the relief sought . . . ."); *see also Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir. 1991) (complaint may not be amended through an opposition to summary judgment) (cited with approval in *Northington v. McGoff*, 968 F.2d 20 at *4 (10th Cir. 1992) (unpublished table decision)). But even without evidence of actual damages, he may obtain nominal damages for his breach of contract claim. *See Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001) ("[N]ominal damages are recoverable upon a breach of contract if no actual or substantial damages resulted from the breach or if the amount of damages has not been proven." (citation omitted)); *see also GeoMetWatch Corp. v. Hall*, No. 1:14-CV-00060-JNP, 2018 WL 6240991, at *16 (D. Utah Nov. 27, 2018) (a failure to disclose a damages calculation does not preclude a claim for nominal damages).

The court, therefore, grants partial summary judgment in favor of Nature's Sunshine and Synergy on Feldman's breach of contract claim. Feldman may seek nominal damages for this claim but he may not obtain actual damages.

## II.     HEALTHBANC'S AND FELDMAN'S MOTIONS FOR SUMMARY JUDGMENT

Synergy countersued HealthBanc for breach of contract. Synergy also asserted a fraud in the inducement counterclaim against HealthBanc and Feldman. HealthBanc and Feldman move for summary judgment on both of these claims.

### A.  Breach of Contract

Synergy asserts that HealthBanc breached the royalty agreement in two ways. First, Synergy argues that HealthBanc warranted that it owned intellectual property rights to the Greens Formula in the royalty agreement. Synergy contends that HealthBanc breached this warranty because it owned no intellectual property rights in the formula. Second, Synergy alleges that HealthBanc breached provisions of the royalty agreement that required it to provide consultation services.

#### 1)  Warranty of Exclusive Ownership

##### i.      The Plain Language of the Contract

Synergy asserts that HealthBanc warranted in the royalty agreement that it owned intellectual property rights to the Greens Formula and that HealthBanc breached this contractual warranty because it did not possess the promised rights. This breach of contract claim fails because HealthBanc did not promise that it owned intellectual property rights in the royalty agreement.

Synergy bases this breach of contract claim on two provisions of the royalty agreement. First, it points to an assignment of rights provision: "In consideration of the sum of $1.00 . . . , HealthBanc hereby transfers and assigns to Synergy and its successors and assigns, HealthBanc's

entire rights, title, and interest in and to the Greens Formula, including, without limitation, all patent rights and other intellectual property rights of any kind . . . ." Second, it cites one of the warranties found in the royalty agreement: "HealthBanc hereby represents and warrants that it is the sole and exclusive owner of the entire rights, title and interest, including without limitation all patent, trademark, copyright and other intellectual property rights, in and to the Greens Formula, as identified in Exhibit A and Exhibit B . . . , free and clear of all liens, claims or encumbrances." Synergy argues that these two provisions equate to a representation that HealthBanc in fact owned intellectual property rights to the Greens Formula and that these unspecified rights were transferred to Synergy. But this reading of these provisions is not supported by the plain language of the royalty agreement.

The assignment of rights provision, for example, contains a main clause stating that HealthBanc transferred its "entire rights, title, and interest in and to the Greens Formula" to Synergy. This language is followed by a dependent clause clarifying the scope of the rights transferred: "including, without limitation, all patent rights and other intellectual property rights of any kind." This dependent clause makes clear that this transfer of all of HealthBanc's property rights to the Greens Formula includes all patent or intellectual property rights it held. In other words, HealthBanc did not represent that it owned intellectual property rights to the Greens Formula and that it was transferring those rights to Synergy. The plain language of this provision is merely an agreement to transfer all of HealthBanc's rights, including any intellectual property rights, to Synergy.

The assignment of rights provision is similar to a quitclaim deed. "The distinguishing characteristic of a quitclaim deed is that it is a conveyance of the interest or title of the grantor in and to the property described, rather than of the property itself." 3 A.L.R. 945 (1919). The

assignment of rights provision in this case used common quitclaim parlance to transfer HealthBanc's "entire rights, title, and interest" in the Greens Formula to Synergy. *See, e.g.*, *Vicksburg Waterworks Co. v. City of Vicksburg*, 185 U.S. 65, 77–78 (1902) (describing quitclaim deed that assigned "all rights, titles, and interest" in a property); *Salcedo–Hart v. Burningham*, 656 F. App'x 888, 890 (10th Cir. 2016) (unpublished) (describing quitclaim transfer of an individual's "rights, title, and interests" in a number of partnerships); *Capital Assets Fin. Servs. v. Maxwell*, 994 P.2d 201, 203 (Utah 2000) ("Lott's quitclaim, on its face, conveyed all her rights, title, and interest in the property to Christensen . . . ."). In other words, HealthBanc transferred all of the rights it held to the Greens Formula, including all intellectual property rights, to Synergy. Similar to a quitclaim deed, HealthBanc agreed to transfer all rights that it had; it did not contract to convey any specific intellectual property right to Synergy.

Synergy's reading of the warranty provision suffers from a similar defect. The main clause of the warranty provision represents that HealthBanc was "the sole and exclusive owner of the entire rights, title and interest . . . in and to the Greens Formula." Embedded in this main clause is a dependent clause that further defines the scope of HealthBanc's exclusive ownership rights to the Greens Formula, which "includ[ed] without limitation all patent, trademark, copyright and other intellectual property rights." Taken together, these two clauses represent that all property rights to the Greens Formula, including all intellectual property rights, were held by HealthBanc. This warranty clause does not guaranty that HealthBanc owned some unidentified property right to the Greens Formula. It states only that no other entity or person held any rights to the formula, including any intellectual property rights.

In short, it would have been simple for the parties to draft a clause that guaranteed HealthBanc held specific intellectual property rights to the Greens Formula. But, as noted above,

the contract does not contain such a provision. Thus, Synergy's breach of contract counterclaim, to the extent that it is based upon the existence of such a guaranty, fails as a matter of law.

ii.     Statute of Limitations

HealthBanc is also entitled to summary judgment on the breach of the alleged intellectual property warranty for a second reason: this claim is barred by the statute of limitations. "In a breach of contract action the statute of limitations ordinarily begins to run when the breach occurs." *Helfrich v. Adams*, 299 P.3d 2, 5 (Utah Ct. App. 2013). Here, any breach of the purported warranty that HealthBanc held intellectual property rights to the Greens Formula would have occurred on the date that the royalty agreement was executed, December 6, 2006. Thus, the six-year statute of limitations for breach of a written contract would have run by December 6, 2012—long before Synergy filed its breach of contract counterclaim in 2016. *See* UTAH CODE § 78B-2-309.

Accordingly, Synergy can assert its breach of contract claim only if it can prove that the statute of limitations was tolled by the discovery rule, which delays the running of the limitations period until the plaintiff knows the facts supporting the cause of action or has "sufficient information to put [the plaintiff] on notice to make further inquiry." *Macris v. Sculptured Software, Inc.*, 24 P.3d 984, 990 (Utah 2001). Thus, "if a party has knowledge of some underlying facts, then that party must reasonably investigate potential causes of action because the limitations period will run." *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 156 P.3d 806, 811 (Utah 2007).

Here, Synergy's Rule 30(b)(6) representative, Dan Norman, admitted that he had concerns regarding the existence of intellectual property rights to the Greens Formula in 2007 or 2008:

> Q. When did you first become aware that there was any issue with property rights in the [Greens Formula]?
>
> A. When I started reviewing the contract.

Q. When was that?

A. When I be -- you know, you had asked me that question and I said around '07 or '08. I don't know the exact date.

Q. In '07 or '08 --

A. Yeah.

Norman's admission that he questioned the property rights associated with the Greens Formula in 2007 or 2008 means that the statute of limitations could not have been tolled after December 31, 2008. *See Macris*, 24 P.3d at 990 ("[A]ll that is required to trigger the statute of limitations is sufficient information to put plaintiffs on notice to make further inquiry if they harbor doubts or questions."). Based upon Synergy's acknowledged suspicions, it had a duty to undertake the minimal effort required to investigate whether there was a patent or other intellectual property right associated with the formula. Accordingly, the six-year statute of limitations ran before Synergy asserted its breach of contract counterclaim in March 2016.

2)      Consultation Services Clause

The royalty agreement obliges HealthBanc to provide consultation services to Synergy as "reasonably required": "In consideration of the royalty payments, HealthBanc shall provide the full benefit of their knowledge, experience and skill to render to Synergy whatever consultation services as may be reasonably required in order to research, develop and market the Greens Formula." Synergy asserts that HealthBanc also breached this provision of the contract.

HealthBanc argues that this breach of contract claim fails because Synergy did not bring this claim within the statute of limitations. In support of this argument, HealthBanc cites an interrogatory response made by Synergy that "from the very start" of the 2006 royalty agreement, HealthBanc provided "little to no support" to Synergy. HealthBanc asserts that this response establishes that any breach occurred around 2006 and that Synergy's 2016 counterclaim for breach

of contract was brought beyond the six-year statute of limitations for breach of a written contract. *See* UTAH CODE § 78B-2-309. The court concludes that HealthBanc's statute of limitations argument is only partially correct.

When a suit is brought on a contract clause that creates a continuing obligation to perform over a period of time, a distinct breach occurs every time performance is due but not rendered. The statute of limitations for each violation of the continuing obligation begins to run when each breach occurs. In *Morris v. Russell*, for example, a plaintiff proved at trial that the defendants promised to pay him a monthly wage for services rendered. 236 P.2d 451, 453–54 (Utah 1951). The plaintiff performed the services for over six years but never received the promised monthly wage. *Id.* at 454. The Utah Supreme Court held that the four-year statute of limitations for breach of an oral contract began to run on each missed monthly payment when the payment was due but not remitted. *Id.* at 456. Thus, the payments that were missed more than four years before the plaintiff initiated the suit were barred by the statute of limitations. *Id.*; *see also State v. Huntington-Cleveland Irrigation Co.*, 52 P.3d 1257, 1263 (Utah 2002) (statute of limitations begins to run each time a continuing contractual obligation is breached).

Here, the consultation services clause creates a continuing obligation on the part of HealthBanc to provide services whenever "reasonably required." The six-year statute of limitations began to run each time consultation services were reasonably required but not rendered. Thus, any breaches of the consultation services clause that occurred more that six years before Synergy asserted its breach of contract counterclaim are barred by the statute of limitations, while any breaches that may have occurred within the six-year statute of limitations are not. Thus, HealthBanc is entitled to only partial summary judgment on Synergy's counterclaim for breach of the consultation services clause.

Synergy claims that HealthBanc and its sole member, Bernard Feldman, are liable for fraudulently inducing it to enter into the royalty agreement. Synergy alleges that HealthBanc and Feldman told two lies that persuaded Synergy to enter into the contract. First, Synergy asserts that HealthBanc and Feldman falsely stated that HealthBanc held intellectual property rights to the Greens Formula. Second, Synergy claims that HealthBanc and Feldman falsely stated that the Greens Formula had been developed and backed by scientists.

This court certified to the Utah Supreme Court the question of whether the economic loss rule would bar Synergy's fraudulent inducement claim. That court held that "the economic loss rule applies where a party's tort claims are entirely duplicative of its contract claims." *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 198 (Utah 2018). Based upon this holding, Synergy conceded that its fraud in the inducement counterclaim against HealthBanc is precluded. Synergy argued, however, that it could still pursue its fraud claim against Feldman because he was not a party to the royalty agreement. Feldman asserts in response that the fraud claim against him fails for three reasons: (1) the fraud claim is barred by the economic loss rule as articulated in the Utah Supreme Court opinion, (2) Synergy has not supported its fraud claim with admissible evidence, and (3) the fraud claim is barred by the statute of limitations. The court determines that it need not address the intricacies of the application of the economic loss rule in this case because Synergy has failed to produce evidence to support all of the elements of its fraud in the inducement claim.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment on a claim is required if the party who bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

"To prevail on a claim of fraudulent inducement, a plaintiff must establish: (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage." *Keith v. Mountain Resorts Dev., L.L.C.*, 337 P.3d 213, 225–26 (Utah 2014) (citation omitted). Synergy cites four sources of evidence to support its fraud in the inducement claim: (1) the declaration of Dan Norman, (2) the declaration of Denise Bird, (3) drafts of the royalty agreement that were circulated before the contract was signed, and (4) the deposition testimony of Ralph Higginson.

### 1) Declaration of Dan Norman

In opposition to HealthBanc's motion for summary judgment, Synergy submitted the declaration of its president, Dan Norman. The declaration states that Feldman failed to disclose that he did not own intellectual property rights to the Greens Formula and that Feldman represented that the formula was backed by scientists. Norman further states that these representations caused Synergy to enter into the royalty agreement. Norman represents that his declaration is based in part

on personal knowledge and in part on information "learned through the ordinary course of business or in conjunction with [his] investigation of the claims at issue in this lawsuit." In his deposition, Norman testified that he did not participate in the negotiation of the royalty agreement and that his information regarding these negotiations came from speaking to people and reading through emails.

HealthBanc and Feldman object to the portions of the Norman declaration that pertain to Feldman's alleged statements and their effect on Synergy because these representations are not based upon personal knowledge. *See* FED. R. CIV. P. 56(c)(4); FED. R. EVID. 602. Synergy concedes that Norman lacks personal knowledge of the contract negotiations. But Synergy argues that because it designated Norman as its Rule 30(b)(6) representative, he is exempt from the personal knowledge requirement. In support of this contention, Synergy cites several district court rulings that conclude that Rule 30(b)(6) representatives may testify about facts outside of their personal knowledge. *See, e.g.*, *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921–22 (N.D. Ill. 2014); *Weinstein v. D.C. Hous. Auth.*, 931 F. Supp. 2d 178, 186–87 (D.D.C. 2013); *Seifried v. Portfolio Recovery Assocs., LLC*, No. 12-CV-0032-JHP, 2013 WL 6185478, at *2 (E.D. Okla. Nov. 25, 2013). HealthBanc, on the other hand, cites authorities holding that the affidavit of a Rule 30(b)(6) representative must be excluded if it is not based upon personal knowledge. *See, e.g.*, *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907 (5th Cir. 2010) (unpublished); *TIG Ins. Co. v. Tyco Int'l Ltd.*, 919 F. Supp. 2d 439, 454 (M.D. Pa. 2013); *Brooks v. Caterpillar Glob. Mining Am., LLC*, No. 4:14CV-00022-JHM, 2017 WL 3426043, at *5 (W.D. Ky. Aug. 8, 2017).

In the absence of binding Tenth Circuit precedent on this question, the court must choose between these conflicting lines of authority. The court concludes that the cases holding that the

affidavits of corporate representatives must be based upon personal knowledge are better reasoned. Rule 602 of the Federal Rules of Evidence states: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." This personal knowledge requirement is incorporated into Rule 56(c)(4) of the Federal Rules of Civil Procedure, which provides: "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge . . . ." Thus, Rule 56(c)(4) explicitly and unequivocally states that affidavits submitted in opposition to a motion for summary judgment must be based on personal knowledge.

The cases ruling that corporate representatives may give testimony that is not grounded on personal knowledge rely upon Rule 30(b)(6), which outlines the procedures for deposing parties to a litigation that are business organizations or government agencies. Under this rule, the organization must designate a representative who "consents to testify on its behalf . . . . about information known or reasonably available to the organization." Some courts have reasoned that if the representative of an organization can give deposition testimony about matters within the organization's knowledge, as opposed to the representative's personal knowledge, the representative must also be able to provide affidavits and trial testimony untethered to the representative's personal knowledge. *See, e.g.*, *Univ. Healthsystem*, 68 F. Supp. 3d at 921–22.

The problem with this interpretation of the Federal Rules of Civil Procedure is that it elevates an inference derived from a rule governing depositions over the text of the rule that specifically governs affidavits produced in opposition to a motion for summary judgment. *Cf. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general." (alteration in original) (citation omitted)). Such an inference cannot countermand the plain text of Rule 56(c)(4),

which requires that an affidavit be based on personal knowledge.[7] The court, therefore, agrees with the Fifth Circuit that "a corporate representative may not testify to matters outside his own personal knowledge 'to the extent that information [is] hearsay not falling within one of the authorized exceptions.'" *Union Pump*, 404 F. App'x at 907–08 (alteration in original) (citation omitted); *accord TIG*, 919 F. Supp. 2d at 454; *Brooks*, 2017 WL 3426043, at *5; *see also Kyco Servs. LLC v. Dep't of Workforce Servs.*, 436 P.3d 268, 275 (Utah Ct. App. 2018) (holding that the Utah analog to Rule 30(b)(6) "applies by its terms only to discovery depositions, and not to trials or evidentiary hearings").

In this case, the portions of the Norman declaration pertaining to the negotiation and signing of the royalty agreement clearly violate the personal knowledge requirement of Rule 56(c)(4). The court, therefore, may not consider the Norman declaration in resolving HealthBanc's motion for summary judgment on the fraud in the inducement counterclaim.

### 2) Declaration of Denise Bird

Synergy also produced the declaration of Denise Bird, who was the Director of Paralegal Services at Nature's Sunshine when Synergy and HealthBanc were negotiating the royalty agreement. Bird assisted outside counsel throughout the negotiation of the royalty agreement. Bird avers that during "the negotiation process, Mr. Feldman stated that the Greens Formula was a proprietary formula" and that it "had been developed by and was backed by scientists." The Bird

---

[7] Rules 30(b)(6) and 56(c)(4) are not inconsistent. Rule 30(b)(6) is a discovery tool that permits the deposing party to identify individuals within an organization with personal knowledge regarding certain subjects. When it is time to file summary judgment motions, only those individuals with personal knowledge may submit affidavits supporting or opposing summary judgment. There is no indication in the text of Rule 30(b)(6) that the drafters of this rule intended to give organizations the special advantage of designating a witness that would be free to disregard the personal knowledge limitation on testimony.

declaration does not clarify whether these statements were made to herself, outside counsel, or other individuals at Synergy.

Setting aside the issue of whether these statements were received by or forwarded to individuals involved in Synergy's decision to enter into the royalty agreement, the Bird declaration cannot support all of the elements of a fraud in the inducement claim. In order to prove its fraud claim, Synergy must proffer evidence that it reasonably relied upon Feldman's alleged representations and that these statements induced Synergy to sign the contract. *See Keith*, 337 P.3d at 225–26; *DeBry v. Cascade Enterprises*, 879 P.2d 1353, 1358 (Utah 1994) ("One critical element of [a fraud] cause of action is actual reliance on a false representation."). Because the Bird declaration does not contain any evidence that the individual who signed the contract on behalf of Synergy relied upon Feldman's alleged statements, the declaration does not support all of the elements of the fraud in the inducement counterclaim.

### 3) Drafts of the Royalty Agreement

Bird attached to her declaration drafts of the royalty agreement that she had emailed to Feldman. Two of the drafts contained the warranty provision found in the signed version of the contract, which guaranties that HealthBanc "is the sole and exclusive owner of the entire rights, title and interest, including without limitation all patent, trademark, copyright and other intellectual property rights, in and to the Greens Formula." Synergy argues that because Feldman did not confess that HealthBanc did not possess intellectual property rights when he received these draft contracts, he effectively represented to Synergy that HealthBanc held intellectual property rights to the Greens Formula.

Synergy's argument rests upon its assumption that the warranty of exclusive ownership clause found in the draft agreements guaranteed that HealthBanc owned intellectual property rights

to the Greens Formula. But as discussed above, this provision makes no such guaranty. It warrants that HealthBanc is the sole and exclusive owner of all rights to the Greens Formula, including any intellectual property rights. *See, supra*, Part II.A.1. Because this provision is not a guaranty of intellectual property ownership, Feldman's silence cannot be interpreted to be an implicit representation that HealthBanc held any intellectual property rights.

Moreover, there is no evidence that any of the decision-makers at Synergy reasonably relied upon Feldman's silence when deciding to enter into the royalty agreement. Therefore, the draft agreements circulated by Bird cannot support the fraud in the inducement counterclaim.

### 4) Deposition Testimony of Ralph Higginson

Finally, Synergy cites the deposition testimony of Ralph Higginson. He testified that he attended an introductory meeting with Feldman and a distributor associated with Synergy, Jeff Schneider. At the meeting Feldman represented that he was "an exclusive owner" of the Greens Formula and that the individual that developed the formula was "very influential and very knowledge-based." After this initial meeting, Higginson had no further involvement in the negotiations between HealthBanc and Synergy.

The Higginson deposition testimony does not support Synergy's fraud in the inducement counterclaim. First, Higginson did not testify that Feldman made either of the allegedly false statements that Synergy asserts as the basis for its counterclaim. Feldman did not say that he held intellectual property rights in the Greens Formula or that it was developed by a scientist. He only stated that he was an exclusive owner of the formula and that it was developed by someone who was very knowledge-based. Second, Higginson had no knowledge regarding the negotiation of the royalty agreement or why Synergy signed it. Thus, his deposition testimony does not support the reasonable reliance element of the fraud counterclaim.

5) Conclusion

Synergy has not produced admissible evidence that it reasonably relied upon any statement made by Feldman when it decided to sign the royalty agreement. Notably, Synergy has not produced any testimony from the individual who signed the contract on behalf of Synergy or any other person involved in Synergy's decision to enter into the agreement. Thus, Synergy has not produced evidence to support all of the elements of its fraud in the inducement claim, and HealthBanc and Feldman are entitled to summary judgment on this cause of action.

## III.  HEALTHBANC'S MOTION TO EXCLUDE EXPERT TESTIMONY

HealthBanc moved to exclude the expert opinions of Synergy's expert, Marc Meyers. Synergy initially opposed the motion. But at the hearing on the motion, Synergy withdrew its opposition. Accordingly, the court grants the motion to exclude the expert opinions of Meyers.

## IV.  SYNERGY'S MOTION TO EXCLUDE EXPERT TESTIMONY

Synergy moved to exclude the expert opinions of HealthBanc's expert, Richard Hoffman, regarding Synergy's future sales of products based upon the Greens Formula. After the hearing on this motion, HealthBanc withdrew Hoffman's opinions on Synergy's future sales figures. Accordingly, the court denies Synergy's motion as moot. Hoffman may not testify about Synergy's predicted sales figures at trial.

## CONCLUSION AND ORDER

The court rules as follows on the motions filed by the parties:

1) The court GRANTS IN PART and DENIES IN PART Synergy's and Nature's Sunshine's motion for summary judgment. [Docket 125]. The motion is granted to the extent that Synergy and Nature's Sunshine seek summary judgment on Feldman's damages claim for breach of the confidentiality agreement. Feldman may seek only nominal damages for

breach of the confidentiality agreement at trial. The motion is denied to the extent that Synergy and Nature's Sunshine seek summary judgment on HealthBanc's breach of contract and breach of the covenant of good faith and fair dealing claims based on the royalty agreement. The court also denies summary judgment on HealthBanc's injunctive relief claim.

2) The court GRANTS IN PART and DENIES IN PART  HealthBanc's motion for summary judgment on Synergy's breach of contract counterclaim. [Docket 129]. The court grants summary judgment on Synergy's counterclaim for breach of the exclusive ownership clause. The court also grants summary judgment on Synergy's counterclaim for breach of the consultation services clause to the extent that Synergy seeks damages for breaches that occurred more than six years before it filed its counterclaim. The court denies summary judgment to the extent that Synergy seeks damages for breaches that occurred within six years of the filing of its counterclaim.

3) The court GRANTS HealthBanc's and Feldman's motion for summary judgment on Synergy's fraud in the inducement counterclaim. [Docket 150].

4) The court GRANTS HealthBanc's motion to exclude expert testimony. [Docket 121].

5) The court DENIES AS MOOT Synergy's motion to exclude expert testimony. [Docket 122].

HealthBanc's claims that remain for trial include its breach of contract and breach of the covenant of good faith and fair dealing causes of action. Feldman may also seek nominal damages for his claim for breach of the confidentiality agreement. Synergy may pursue its counterclaim for breach of the consultation services clause, but only for breaches that may have occurred less than six years before it asserted the counterclaim.

Signed August 1, 2019.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge